**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| *In re:* | : | **Chapter 11** |
| **TIG REAPER LLC,** | : | **Bankruptcy No. 26-13937** |
| **Debtor.** | : | |
| *In re:* | : | **Chapter 11** |
| **REAPER TIME PA 1 LLC** | : | **Bankruptcy No. 26-** |
| **Debtor.** | : | |
| *In re:* | : | **Chapter 11** |
| **REAPER TIME PA 2 LLC** | : | **Bankruptcy No. 26-** |
| **Debtor.** | : | |
| *In re:* | : | **Chapter 11** |
| **REAPER TIME NJ 1 LLC** | : | **Bankruptcy No. 26-** |
| **Debtor.** | : | |

**DECLARATION OF JIGER PATEL IN SUPPORT OF FIRST DAY MOTIONS FILED BY THE DEBTORS**

Jiger Patel, a member and manager of each of the Debtor Entities (as defined herein), makes the following Declaration in Support of the First Day Motions:

1. The Debtor Entities are TIG Reaper LLC (9570), Reaper Time PA 1 LLC (7662), Reaper Time PA 2 LLC (7483), and Reaper Time NJ 1 LLC (3867) (hereinafter referred to collectively as the "Debtor Entities" or "Debtors")[1].

---

[1] The last four digits of each of the Debtors' TIN is referenced herein.

2. The Debtor Entities operate seven (7) franchised Dave's Hot Chicken at leased properties in Pennsylvania, Delaware and New Jersey. A list of the locations is attached hereto as Exhibit "A". The Debtor Entities also have three (3) locations in late stages of development, with one (1) in New Jersey and two (2) in Delaware.

3. TIG Reaper LLC, the lead Debtor, is a Delaware Limited Liability Company, as The remaining Debtor Entities are Limited Liability Companies formed under the laws of the Commonwealth of Pennsylvania and State of New Jersey and are affiliated with the lead Debtor. TIG Reaper is the majority owner of Reaper Time PA 1 LLC, Reaper Time PA 2 LLC and Reaper Time NJ 1 LLC.

4. The Debtor Entities are parties to Lease Agreements at all ten (10) locations.

5. The Debtors are parties to franchise agreements with Dave's Hot Chicken Franchise Co., LLC (the "Franchisor") for each of the Dave's Hot Chicken locations. A true and correct copy of one of the Franchise Agreements is attached hereto as Exhibit "B". The remaining agreements are substantially similar.

6. The Debtor Entities are current on all franchise fees and royalties due to the Franchisor.

7. The Debtor Entities pay a bi-weekly payroll for 194 employees as follows: TIG Reaper LLC – 138 employees, $117,900.02; Reaper Time PA 1 LLC – 25 employees, $27,769.09; Reaper Time PA 2 LLC – 30 employees, $31488.27. Reaper Time NJ 1 LLC currently 1 employee, $3,234.60 and Rehoboth Beach under TIG Reaper LLC is set to open on or about October 15 , 2026 and payroll is set to begin on September 25, 2026.

8. Payroll is paid once every two weeks, with one week in arrears. Workers compensation insurance is paid with each payroll.

9. The Debtor Entities are current on payroll, payroll taxes and benefits.

10. The officers of the Debtor Entities and their salaries are as follows:

a. Manisha Patel, Member. Salary $0.00.

b. Jiger Patel, Executive Officer.: Salary $0.00

11. Attached as Exhibit "C" hereto are the most recent quarterly combined financial statements of the Debtor Entities.

12. The Debtor Entities are parties to multiple lending agreements as will be discussed herein. Attached hereto as Exhibit "D" are searches of the State of Delaware, which represents the majority of the liens.

13. The Debtor Entities are parties to a Management Agreement with TIG Corp., an affiliated company. TIG Corp. provides back-office accounting and other corporate functions for combined fee of 4% of gross revenue.

14. The Debtor Entities have four (4) primary food vendors who are designated by the franchisor. Those vendors are MQ & Son Distributing (Martins potato rolls): Nuco2; Performance Food Services; and Restaurant Technologies, Inc. The Debtor Entities pay each vendor on a week to week basis for all current orders.

15. The Debtor Entities are parties to various loans and financing arrangements. The Debtor Entities aver that the Bank Midwest (defined below) has a first lien on most assets.

16. Prior to the Petition Date, the Debtor Entities received funds from Merchant Cash Advance lenders. The Debtor has security agreements (which are junior to Bank of Midwest as follows):

a. Parafin, Inc. dated January of 2026 in the amount of roughly $105,000.00, which is allegedly secured by future receivables.

b. Mint Funding, Inc. dated March 13, 2026 in the amount of roughly $150,000.00, which is also secured by alleged future receivables.

c. Rewards Network dated January 15, 2026 in the amount of roughly $50,000.

17. In addition to the Merchant Cash Advance companies, Allegiance Funding Group has a secured equipment lease with regards to Reaper Time NJ 1, LLC.

18. The Debtor Entities also received funding from private individuals.

19. The Debtor Entities do not have accounts receivable, only maintain a minimal inventory and any equipment or tenant improvements are secured by various lenders with liens at specific locations.

20. As a result, the Debtor Entities aver that the Merchant Cash Advance lenders and/or private investors are wholly unsecured as to the Debtor Entities. The Debtor's proposed cash flow does not intend to make payments to the Merchant Cash Advance Companies.

21. The Debtor Entities have prepared a cash flow budget, attached as Exhibit "E" which provides for the post-petition payment of food vendors, employees and employee related expenses (taxes and benefits), lease payments, and other occupancy costs. The Debtor Entities have also included weekly deposits of $15,000 to cover post-petition legal fees of Debtor's counsel and Special Counsel. The Debtor Entities believe the cash flow set forth in Exhibit "E" provides a reasonable prospect of a reorganization and the preservation of almost 200 jobs. The cash flow shows the Debtor making current rent payments starting with October rent. The cash flow also shows continued payment of all franchise fees.

22. As part of the cash flow budget, the Debtor's principals are providing a junior Debtor-in-Possession Secured Loan in the amount of $200,000 in order to provide funding and/or cushion for the first interim period.

23. Pursuant to franchise agreements the Debtor Entities participate in various loyalty programs as part of the Dave's Hot Chicken system. The Debtor Entities are current on all obligations to Dave's Hot Chicken and all gift card obligations. As a point of clarity, the day any of the Debtor Entities sells a gift card, the funds received on account of the gift card are immediately withdrawn and sent to the franchisor. Whenever any of the Debtor Entities honor a gift card, the Debtor receives those funds on a daily basis from the processor.

24. The Debtor Entities have in place insurance for all locations and copies of the Certificates of Insurance are available from counsel to the Debtor Entities.

25. Copies of all Lease Agreements and Franchise Agreements are in the possession of counsel to the Debtor Entities.

26. The Debtor Entities have utility services at each of its locations. The Debtor is current on all utility services. All utility services are critical to the reorganization of the Debtor Entities. The cash flow attached as Exhibit "E" includes payment for all post-petition utilities.

## HISTORY AND CAUSE OF THE BANKRUPTCY

27. In August 2024, Bank Midwest, a division of NBH Bank ("Bank Midwest") made a loan to TIG Reaper LLC in the original principal amount of $1,650,000.00 (the "Term Loan") evidenced by that certain Term Loan A Note dated August 15, 2024 (as amended and/or modified the "Term Note") executed by TIG Reaper LLC in favor of Bank Midwest.

28. Also in August 2024, Bank Midwest made a loan to TIG Reaper LLC in the original principal amount of $8,350,000.00 (the "DLOC Loan", together with the Term Loan, the "Loans") evidenced by that certain DLOC Note (the "DLOC Note", together with the Term Note, the "Notes") executed by TIG Reaper LLC in favor of Plaintiff.

29. On or about August 15, 2024, TIG Reaper LLC executed that certain Security

Agreement (the "Security Agreement") in favor of Bank Midwest and granted Bank Midwest a first-priority security interest in all of TIG Reaper LLC's assets.

30. The Debtor Entities entered into a Modification Agreement whereby Reaper Time NJ 1, LLC, Reaper Time PA 1, LLC and Reaper Time PA 2 LLC agreed to jointly and severally assume all obligations and payments to the original loan agreement with TIG Reaper, LLC.

31. On or about September 8, 2026, Bank Midwest filed a Verified Complaint against the Debtor Entities alleging various non-payment defaults that are disputed by the Debtor Entities. A true and correct copy of the Verified Complaint is attached hereto as Exhibit "F."

32. In addition to the Verified Complaint, Bank Midwest filed an Emergency Motion for a Receiver.

33. In addition to various non-payment defaults, Bank Midwest sought to declare a default of the Debtors based on defaults of other entities. Specifically, Bank Midwest alleges that all assets owned by Borrower secure the indebtedness owed to Lender by TIG Queso LLC, Queso Time De 1 LLC, Queso Time De 2 LLC, Queso Time De 3 LLC, Queso Time De 4 LLC, Queso Time De 5 LLC, Queso Time Tpa 1 LLC, Queso Time Tpa 2 LLC, Queso Time Tpa3 LLC, Queso Time NJ 1 LLC, Queso Time NJ 10 LLC, Queso Time NJ 11 LLC, Queso Time NJ 12 LLC, Queso Time NJ 17 LLC, Queso Time NJ 2 LLC, Queso Time NJ 20 LLC, Queso Time NJ 3 LLC, Queso Time NJ 4 LLC, Queso Time NJ 5 LLC, Queso Time NJ 6 LLC, Queso Time NJ 9 LLC, Queso Time NJ 15 LLC, Queso Time NJ 18 LLC, Queso Time NJ 19 LLC, Queso Time NJ 21 LLC, Queso Time NJ 22 LLC, Queso Time Ny 1 LLC, Queso Time Ny 2 LLC, Queso Time Ny 3 LLC, Queso Time Ny 4 LLC, Queso Time Pa 1 LLC, Queso Time Pa 10 LLC, Queso Time Pa 11 LLC, Queso Time Pa 2 LLC, Queso Time Pa 3 LLC, Queso Time Pa 6 LLC, Queso Time Pa 7 LLC, Queso Time Pa 8 LLC, Queso Time Pa 9 LLC, Queso Time Pa 12 LLC,

Tig Queso Ny LLC, Tig Queso De LLC, Tig Queso NJ LLC, Tig Queso Pa LLC, Tig Queso Fl LLC (collectively, "Queso Entities").

34. Due to separate and distinct reasons, the Queso Entities agreed to the appointment of a receiver of their assets in order to liquidate the locations for the benefit of their creditors.

35. Bank Midwest sought to use the appointment of a Receiver for the Queso Entitles as a basis for the appointment here despite the fact that Bank Midwest has been paid current and the Debtor Entities are not in any payment default.

**LITIGATION WITH BANK OF MIDWEST**

36. Attached hereto and incorporated herein is an Adversary Complaint, which is being filed concurrently with the Debtor's First Day Motions, against Bank Midwest (the "Adversary Complaint"). A true and correct copy of the Adversary Complaint is attached hereto as Exhibit "G."

37. The Adversary Complaint seeks declaratory relief and damages stemming from Bank Midwest's unlawful efforts to collect loans to the Queso Entities by improperly accelerating separate loans to the Debtor, manufacturing non-monetary defaults, and ultimately filing a lawsuit to appoint a receiver.

38. In short, at the time it extended loans to the Queso Entities, Bank Midwest did not obtain (or even request) a guarantee or other security from the Debtors. When Debtors refused to sign a draconian forbearance agreement that would force Debtors to pay the debts of Queso Entities, Bank Midwest purported to accelerate Debtors' loans and informed Franchisor that it intended to seek a receiver.

39. At the time, Debtors were seeking to sell their businesses and received a favorable offer of approximately $30 million, which would have been more than enough to satisfy Debtors'

loans from Bank Midwest. Once word spread to potential buyers, the offer was cut nearly in half and further efforts to sell the business have been hampered.

40. Debtors now seek a declaration and/or injunctive relief confirming that Debtors are not responsible for the debts of the Queso Entities and damages for the loss in value caused by Bank Midwest's misconduct.

## MOTION TO HONOR FRANCHISE AGREEMENTS AND LOYALTY PROGRAMS

41. The franchise agreements and associated loyalty programs of which the Debtor Entities are a party are necessary to the reorganization of the Debtor Entities. Each location is a custom designed Dave's Hot Chicken location. There is no current cure amount due to the franchisor and no gift card liability.

42. The Debtor Entities honor all promotions and marketing campaigns and are otherwise compliant with their obligations under each of the franchise agreements.

43. The Debtor Entities aver the franchise agreements are market based and provide a substantial benefit to each Debtor entity.

44. Pending confirmation of the Plan, the Debtor Entities seek authorization to honor the franchise agreements and all loyalty programs with Dave's Hot Chicken Franchise Co., LLC.

## MOTION UNDER 11 U.S.C. SECTION 366 FOR CONTINUED UTILITY SERVICE TO ALL LOCATIONS

45. The Debtor Entities have filed a Motion pursuant to Section 366 of the Bankruptcy Code to require continuous utility service to all locations (the "Utility Motion").

46. The Debtor Entities are making all post-petition payments to all utility providers and are agreeing to make deposits of one month of service paid over sixty days in two installments.

47. The Debtor Entities aver that the current utility payments in the cash collateral budget, Exhibit "G", and the deposits provided in the Utility Motion provide adequate protection to each utility provider.

**MOTION FOR JOINT ADMINISTRATION**

48. The four (4) Debtor Entities maintain separate books and records and lists of creditors and file separate tax returns.

49. Each of the Debtor Entities maintains a separate existence but operates in conjunction with each other Debtor Entity. Although TIG Reaper, LLC maintains separate locations, each of Reaper Time PA 1, LLC, Reaper Time PA 2, LLC and Reaper Time NJ 1, LLC is a single level entity.

50. There are common creditors among the Debtor Entities, depending on the location of each store.

51. Each of the Debtor Entities has a management agreement with TIG Corp.

52. The cash flow on Exhibit E is a combined cash flow of the entities operating Dave's Hot Chicken restaurants.

53. The Debtor Entities aver that joint administration will assist in the reorganization of the Debtor Entities by allowing pleadings to be filed under on docket number and name.

**MOTION TO PERMIT ORDINARY COURSE PAYMENTS TO FOOD VENDORS**

54. The Debtor Entities have four (4) primary food vendors who are designated by the franchisor. Those vendors are MQ & Son Distributing (Martins potato rolls): Nuco2; and Performance Food Services and Restaurant Technologies, Inc.

55. The Debtor Entities have weekly spending of $70,000 with Performance Food Services and do not currently owe any money.

56. The Debtor Entities desire to continue their current arrangement with each of the food vendors.

57. The food vendors are each mandated by the Franchisor.

58. To the extent the food vendors are providing fresh produce, the Debtor Entities can avoid PACA claims and liens under Perishable Agricultural Commodities Act.

59. Maintaining the weekly payments for current deliveries for each of the food vendors will benefit the estate by minimizing disruption and avoiding PACA liens.

60. The pre-petition balances are nominal compared to the weekly spend with each food vendor and are primarily for deliveries within twenty days of the Petition Date.

**MOTION FOR AUTHORITY TO PAY PRE-PETITION WAGES**

61. The Debtor Entities have almost 200 employees who are paid biweekly.

62. Payroll is funded depending on the entity on each Friday of the funding week.

63. Because payroll is calculated with one week of arrears, there will be a pre-petition payroll of at least fourteen days depending on the day the Debtor Entities file.

64. No one employee will receive pre-petition payroll in excess of the priority amount under the Bankruptcy Code.

65. There are no insiders receiving payroll under this order.

66. The employees are the lifeblood of the Debtor Entities. They are the face of the organization and critical to the successful reorganization of the Debtor Entities.

67. Payment of pre-petition wages is necessary and critical to the Debtor Entities' reorganization effort.

## MOTION FOR USE OF CASH COLLATERAL AND TURNOVER OF CASH COLLATERAL

68. Exhibit "E" represents a comprehensive cash flow budget of the Debtor Entities providing full payment of all post-petition expenses, lease payments, franchise fees and includes payments to Bank Midwest.

69. The Debtor Entities can operate and responsibly determine the best path forward.

70. The budget includes payments to all lessors and employee related items, adequate protection payments to the secured lenders, a reserve for legal fees and all other costs of operation such as insurance and utilities.

71. Use of cash collateral pursuant to the budget will allow the Debtor Entities the space and ability to reorganize and preserve 200 jobs and 7 store locations (that are open).

72. The continuation of insurance, maintenance of all locations and payment of franchise obligations provides the best path forward for the Debtor Entities and their creditors.

73. Use of cash collateral pursuant to the budget will result in an increase in net cash and preservation of the estate, all of which, along with adequate protection payments to the Bank Midwest provide all parties with interest in cash collateral adequate protection.

74. The Debtor Entities specifically seek authority to receive a junior DIP loan in the amount of $200,000 to assist in cash flow for the first interim period.

75. The Debtor Entities aver that the restaurants, as operating entities, are the highest and best use of the Debtor's assets.

76. The Debtor Entities on a pre-petition basis paid its secured creditors, taxing authorities, employees and food vendors on a current basis.

77. The Debtors' continued operations and monthly payment to Bank Midwest, as well as replacement liens, provide adequate protection for use of cash collateral.

78. To be clear, cash collateral consists of cash $20,000, cash in transit $200,000 and inventory of $105,000, which totals roughly $325,000.00.

79. The Debtors' continued operations will maintain that level of cash collateral and the Debtors are obligated to adequately protect that level of cash collateral.

80. Furthermore, upon information and belief, Parafin, Inc. and/or Mint Funding has sent a demand letter to Doordash and Doordash/Stripe is currently froze nearly $100,000.00 of the Debtor's assets. Due to the filing of the bankruptcy, the Debtor seeks immediate turnover of these funds. A true and correct copy of the Notice to UCC Liens are attached as Exhibit "H"

**MOTION FOR AUTHORITY TO USE PRE-PETITION BANK ACCOUNTS**

81. The Debtor Entities currently bank at the institutions and with last four of any account number on the schedule attached as Exhibit "I".

82. The Debtor Entities receive a substantial amount of funds through credit card processing for which the redirection of those funds to new accounts with amended processor agreements has a substantial negative risk for cash flow.

83. The Debtor Entities request authority with appropriate safeguards to continue to use the pre-petition bank accounts.

Dated: September 21, 2026

***/s/ Jiger Patel***
Jiger Patel